DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Guyan International, Inc. dba Permco, et al., | ) | |
| | ) | CASE NO. 5:10 CV 823 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| Professional Benefits Administrators, Inc., et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Federal Insurance Company and Gotham Insurance Company, | ) | |
| | ) | |
| New Party Defendants. | ) | |
| | ) | |

The number of plaintiffs, defendants, counterclaims, crossclaims, third-party complaints and supplemental complaints in this case make it unusually complex.  Further, there are three other cases that are related to the above-captioned matter.[1]  The related cases and instant action are presently stayed except as to Plaintiffs' (as hereafter defined) claims in their Supplemental Complaints (hereafter discussed) against Federal Insurance Company (Federal) and Gotham Insurance Company (Gotham) to collect their judgments against defendant Professional Benefits Administrator from the insurance policies issued by Gotham and Federal to Professional Benefits Administrator.

_____

[1] Case Nos. 5:11 CV 1033, 1:11 CV 1038, 5:11 CV 1512.

(5:10 CV 823)

There are three motions for summary judgment pending with respect to Plaintiffs'

Supplemental Complaints: 1) Plaintiffs' motion for summary judgment against Federal and

Gotham (ECF 362);[2] 2) Federal's motion for summary judgment (ECF 363);[3] and 3) Gotham's

motion for summary judgment (ECF 361).[4]

For the reasons that follow:

1.     Plaintiffs' motion for summary judgment is GRANTED IN PART and DENIED
       IN PART:

       a. Plaintiffs' motion as against Federal is GRANTED;

       b. Plaintiffs' motion as against Gotham is DENIED.

2.     Federal's motion for summary judgment is DENIED.

3.     Gotham's motion for summary judgment is GRANTED IN PART and DENIED
       IN PART:

       a. Gotham's motion as to Plaintiffs' Supplemental Complaints is GRANTED;

       b. Gotham's motion as to Gotham's counterclaims is DENIED AS MOOT.

## I.  PROCEDURAL BACKGROUND

A.     Permco's and Intervening Plaintiffs' Complaints

A brief summary of the background of this case is warranted in order to provide a context

for the three pending summary judgment motions.  This case was initially filed by plaintiff

---

[2] Federal and Gotham opposed the motion (ECF 428 and 429, respectively) and Plaintiffs replied (ECF 438 and 435, respectively).

[3] Plaintiffs opposed the motion (ECF 425) and Federal replied (ECF 433).

[4] Plaintiffs opposed the motion (ECF 426) and Gotham replied (ECF 434).

(5:10 CV 823)

Guyan International, Inc., dba Permco (Permco), against defendants Professional Benefits

Administrators (PBA) and Robert Hartenstein (Hartenstein).  Permco retained PBA as a third

party administrator to administer Permco's self-funded Employee Benefit Plan (Permco Plan)[5]

and to pay Permco's employees' health benefit claims under the Permco Plan with funds

provided by Permco to PBA for that purpose.  At some point, Permco became aware that PBA

had not paid the Permco Plan claims and Permco Plan funds were unaccounted for.  As a

consequence, Permco sued PBA and Hartenstein for breach of fiduciary duty under ERISA and

for breach of the terms of the benefits services agreement between PBA and Permco.

After Permco filed this case against PBA and Hartenstein, five intervening plaintiffs[6]

with similar allegations joined the lawsuit.[7]  Like Permco, the intervening plaintiffs retained

PBA to administer their self-funded employee health benefit plans.  The claims of the

intervening plaintiffs all relate to PBA's failure to pay the health care claims of intervening

plaintiffs' employees with plan funds provided to PBA by the intervening plaintiffs for that

purpose.

---

[5] The Permco Plan, and the other Plaintiffs' employee benefit plans, are ERISA plans.

[6] Pritchard Mining Company (Pritchard), Merit Gear, LLC (Merit
Gear), Precision Gear, LLC (Precision Gear), Sheltering Arms Hospital Foundation (Sheltering
Arms), and Hocking, Athens, Perry Community Action Agency (HAPCAA).

[7] Pritchard's Amended Intervening Complaint (ECF 84); Merit Gear's Intervening
Complaint (ECF 139); Precision Gear's Intervening Complaint (ECF 139); Sheltering Arms'
Intervening Complaint (ECF 141); and HAPCAA's Intervening Complaint (ECF 126).

(5:10 CV 823)

Multiple crossclaims and third-party complaints ensued adding four additional parties to the lawsuit.[8]  The claims of the intervening plaintiffs, crossclaimants, counterclaimants, and third-party complaints all relate to who is responsible for the loss of Plaintiffs' plan funds.

PBA was insolvent.  The Court appointed a Receiver for PBA, Attorney Ray Weber.  Receiver Weber retained a forensic accountant, Stephen Nelder, to examine PBA's books and records.  Mr. Nelder prepared a report of his findings.

B.    Permco's and Intervening Plaintiffs' Motions for Partial Summary Judgment

In the interest of advancing the core claim of the case, the Court allowed Permco and the intervening plaintiffs to file motions for partial summary judgment against PBA only, and stayed all other aspects of the case.  Permco moved for partial summary judgment against PBA on Counts III (breach of fiduciary duty under ERISA) and IV (breach of contract) of Permco's complaint, and the Court granted partial summary judgment in favor of Permco and against PBA on Count III in the amount of $501,380.75.  Having ruled that PBA breached its fiduciary duty under ERISA, it was not necessary for the Court to rule on Permco's alternative argument for summary judgment that PBA breached the benefits services agreement with Permco.  ECF 157 and 158.

Pritchard and HAPCAA moved for partial summary judgment on Count 1 (breach of fiduciary duty under ERISA) of their respective intervening complaints,[9] and the Court granted

---

[8] Pamela S. Priddy, Myriad Health, Apple Growth Partners, and Curtis Professional Group.

[9] Pritchard and HAPCAA also moved for partial summary judgment on their breach of contract claims, Count V and Count III, respectively.  However, having ruled that PBA breached

(continued...)

4

(5:10 CV 823)

partial summary judgment in favor of Pritchard and against PBA on Count 1 in the amount of

$409,943.88, and in favor of HAPCAA and against PBA in the amount of $384,574.17.  ECF

232 and 233.[10]

In granting partial summary judgment in favor of Plaintiffs and against PBA, the Court

concluded that PBA was an ERISA fiduciary, that PBA breached its fiduciary duty by using

Plaintiffs' plan funds for PBA's own interests and for its own account, and that PBA's breach of

fiduciary duty caused the loss of Plaintiffs' plan funds.  *See* ECF 157 and 232.  PBA

unsuccessfully appealed to the Sixth Circuit the awards of partial summary judgment in favor of

Plaintiffs.

C.      Plaintiffs' Supplemental Complaints

PBA ceased doing business in 2010 and had no assets to satisfy Plaintiffs' judgments.

While PBA's appeals were pending at the Sixth Circuit, Permco, Pritchard and HAPCAA

(collectively, Plaintiffs)[11] filed supplemental complaints pursuant to Ohio Revised Code Section

3929.06 to collect their judgments against PBA from PBA's insurers, Federal and Gotham.  ECF

209 (Permco's Supplemental Complaint) and 266 (Pritchard and HAPCAA's Supplemental

---

[9](...continued)
its fiduciary duty under ERISA, it was not necessary for the Court to rule on Pritchard's and
HAPCAA's alternative argument for summary judgment that PBA breached their benefits
services agreement.

[10] Intervening plaintiffs Precision Gear and Merit Gear also moved for partial summary
judgment against PBA.  ECF 193 and 194, respectively.  The Court granted partial summary
judgment in favor of Precision Gear and against PBA in the amount of $44,290.12.  ECF 232 and
233.  Merit Gear's motion for partial summary judgment against PBA was denied.  *Id.*

[11] Precision Gear did not file a supplemental complaint to collect its judgment against
PBA.

5

(5:10 CV 823)

Complaint).  Section 3929.06 provides that if a judgment debtor was insured against liability for a judgment creditor's loss, the judgment creditor may file a supplemental action against the insurer for payment of their judgment up to the remaining limit of liability coverage.

In answer to Plaintiffs' Supplemental Complaints, Gotham advanced various affirmative defenses and asserted counterclaims with respect to Plaintiffs' underlying complaints.  ECF 253 and 293.[12]

Federal asserted twenty-six affirmative defenses in answer to Plaintiffs' Supplemental Complaints, but does not assert any counterclaims.  ECF 225 and 299.

Cross motions for summary judgment on Plaintiffs' Supplemental Complaints ensued.  The Court withheld ruling on the cross motions for summary judgment on the question of insurance coverage while PBA's appeals of the Court's judgments in favor of Permco, Pritchard, and HAPCAA  were pending.

The Sixth Circuit affirmed the Court's judgments against PBA.  *Guyan Intern., Inc. v. Professional Benefits Adm'rs, Inc.* 689 F.3d 793 (6th Cir. 2012); *see also* ECF 441 and 444.  As a consequence, the Court's disposition of the pending cross motions on the question of insurance coverage is the next step in the resolution of this case.

---

[12] In its answers/counterclaims, Gotham also asserted a crossclaim and third party complaint against PBA seeking a declaration that Gotham is not obligated to provide a defense or insurance coverage to PBA for claims asserted in Plaintiffs' underlying lawsuits against PBA.  However, the Court granted Plaintiffs' motions to strike/dismiss Gotham's crossclaim/third-party complaint against PBA.  *See* ECF 360.

(5:10 CV 823)

D.     <u>The Parties' Motions for Summary Judgment</u>

The Court will elaborate on the details of the parties' arguments with respect to their motions for summary judgment later in this Memorandum Opinion.  For now, however, the Court will focus on what the parties seek in their motions.

1.     *Plaintiffs' Motion*

In their motion, Plaintiffs claim they are entitled to summary judgment in their favor against Defendants Federal and Gotham on the claims set forth in the Supplemental Complaints, finding insurance coverage for losses suffered by Plaintiffs in the underlying actions.

2.     *Gotham's Motion*

In its motion, Gotham claims that it is entitled to summary judgment on both Plaintiffs' claims in the Supplemental Complaints and Gotham's Counterclaims.

3.     *Federal's Motion*

Federal did not assert any counterclaims against Plaintiffs' Supplemental Complaints.  In its motion, Federal claims that it is entitled to judgment as a matter of law that there is no insurance coverage for Plaintiffs' losses because there was no "Theft" by an "Employee" under the Federal Policy.

(5:10 CV 823)

## II.  FACTUAL BACKGROUND

There is really no dispute regarding the relevant facts in the record before the Court with respect to the three pending motions for summary judgment on the issue of coverage for Plaintiffs' judgments under the Federal Policy and Gotham Policy.  The dispute among the parties centers on how those facts are characterized and the application of those facts to the Gotham and Federal insurance policies with respect to coverage.

A.      <u>PBA's Handling of Plaintiffs' plan funds</u>

In its previously published Memorandum Opinions, the underlying facts of this case have been extensively detailed.  *See* ECF 157 and 232.  Briefly, each of the Plaintiffs self-fund an ERISA healthcare plan established for their employees, and separately entered into a Benefit Management Services Agreement with PBA to serve as the third-party benefits administrator for the Plaintiffs' self-funded plans.  The Plaintiffs are the plan administrators for their respective plans.  The Benefits Management Services Agreements with Plaintiffs were signed on behalf of PBA by the president of PBA.

Defendant Robert Hartenstein was an officer, board member, and majority owner of PBA during the relevant time period.[13]  Hartenstein co-owned PBA with Pamela Priddy, another defendant in this case.  Pamela Priddy, 40 % owner of PBA, was the president of PBA prior to her departure in 2008, after which Hartenstein served as the de facto president of PBA.

---

[13] Robert Hartenstein owns 60% of PBA and was Chairman of the Board, in addition to being the Secretary and de facto president, of PBA.  Hartenstein Depo. p. 16-17 (ECF 397).  The Board of Directors of PBA, to the extent it existed, consisted of Hartenstein and Priddy. Hartenstein Depo. p. 33 (ECF 397).

(5:10 CV 823)

Hartenstein received a salary in connection with his work at PBA.  He also received a "bonus" in addition to his salary which he described as "periodic compensation as additional income."  Hartenstein Depo. pp. 36-37 (ECF 397).  Hartenstein himself determined the timing and amount of his "additional income."  Hartenstein Depo. p. 40 (ECF 397) ("I just do it when I want to.").  In addition to his "additional income," Hartenstein received fringe benefits which included a leased Cadillac and Corvette, country club membership, and entertainment account, all paid by PBA.  Hartenstein Depo. pp. 38-39 (ECF 397).

Pursuant to the Benefits Services Agreement, PBA was to administer and pay the Plaintiffs' employees' healthcare claims with funds provided to PBA by Plaintiffs for that purpose.  According to the agreements between PBA and Plaintiffs, the funds provided to PBA by Plaintiffs were to be deposited in segregated accounts and the PBA could not commingle funds or use monies in the segregated accounts for its own purposes.  *Id.*  PBA was not paid for its services from funds provided for healthcare claims payments, but received a monthly administrative fee with funds to be separately provided by Plaintiffs.

When there were claims to be paid, PBA sent Plaintiffs a written "claim money transfer" form requesting a check for a specific amount supported by a statement of the specific healthcare claims to be paid by the money transfer requested.  The claim money transfer form read in part as follows:

9

(5:10 CV 823)

Re: Claim Money Transfer

The total of your claim payout dated __ is ___.
As soon as our office receives this amount, the checks will be released.

*See* E. Thomas Aff. ¶¶ 3-4 (ECF 101-1) (emphasis added).


At the time PBA requested claim funds, PBA printed the checks to the healthcare providers to be paid by those funds and placed the checks in a filing cabinet until the claim funds were received from Plaintiffs, at which time the provider checks were to be mailed.  D. Donatiello Depo. pp. 98-116 (ECF 425-5).  Plaintiffs sent the requested funds to PBA, which were to be deposited by PBA in a segregated account and used by PBA exclusively to pay the employee healthcare claims listed in the transfer request.

However, those funds were not always deposited into segregated accounts and not used to pay the providers.  PBA's employee Linda Westfall testified at her deposition that it was her "general practice" to deposit Plaintiffs' plan funds into PBA's main account even when Plaintiffs' pending claims were not paid.  However, sometimes Westfall would confer with Robert Hartenstein about exceptional circumstances in which Plaintiffs' plan funds would not be deposited into the main account. L. Westfall Depo. p. 49 (ECF 363-9).

Plaintiffs' claim funds, deposited into PBA's main account instead of segregated accounts, were used by PBA to pay PBA's operational expenses.[14]  PBA's employees knew that

---

[14] PBA's commingling of Plaintiffs' claim funds and the use of Plaintiffs' claim funds for PBA's own operational expenses was confirmed by the forensic accountant, Stephen Nelder, hired by Receiver Weber to examine PBA's books and records.  Mr. Nelder's conclusions were

(continued...)

10

(5:10 CV 823)

Plaintiffs' claims funds should have been segregated and should not have been used for PBA's own expenses.  L. Westfall Depo. pp. 128-131 (ECF 361-4).

The claims money transfer form sent by PBA to Plaintiffs stated that as soon as Plaintiffs provided the funds, provider checks would be released, and that was Plaintiffs' expectation when transferring funds to PBA.  T. Davies Depo. pp. 27-28 (ECF 425-6).  However, provider checks that had been funded for payment by Plaintiffs were not released and accumulated in PBA's file cabinets to the point which additional cabinets had to be purchased to hold all of the unmailed provider checks.  D. Donatiello Depo. pp. 98-116 (ECF 425-5); L. Westfall Depo. pp. 140-42 (ECF 425-10); L. Westfall Depo. pp. 115, 240-41 (ECF 425-7).  PBA employees tracked Plainitffs' funded, but unpaid, claims on a spreadsheet.  L. Westfall Depo. pp. 15-21 (ECF 425-12).

When money was available in PBA's main account, the claims of disgruntled clients and/or the oldest claims were paid.  If there were insufficient funds to pay the oldest claims, then Hartenstein sometimes determined which claims to pay.  L. Westfall Depo. p. 51 (ECF 363-9).

Hartenstein was not the only individual at PBA who made decisions regarding how to use Plaintiffs' plan funds.  Linda Westfall also had the authority to make decision regarding the deposit of client funds into PBA's main account and the use of those funds.  R. Hartenstein Depo. p. 15 (ECF 425-2) (Linda Westfall had oversight over PBA's operations and had authority

_____

[14](...continued)
consistent with PBA's employees's testimony that PBA commingled Plaintiffs' claim funds in PBA's main account and used those funds to pay PBA's operational expenses, to the benefit of PBA's employees.  S. Nelder Depo. pp. 114-18 (ECF 361-9).

(5:10 CV 823)

to change the procedure of depositing client funds intended for the payment of medical claims into PBA's main account); L. Westfall Depo. p. 197, 234 (ECF 425-7) (Linda Westfall had discretion to determine whether to deposit client funds into segregated or main account and which claims were paid.); L. Westfall Depo. p. 24-25 (ECF 425-10) ("mostly everybody" at PBA reported to Westfall and she had discretion as to when to seek input from Hartenstein.). Sometimes the decisions regarding use of Plaintiffs' plan funds were collective.  L. Westfall Depo. pp. 231-34 (ECF 425-7) (discussing e-mail from Holly Kirby indicating that Kirby, Hartenstein and Spencer had "rendered" a decision regarding use of client funds).

Plaintiffs, their employees, and providers became aware and concerned that provider payments were not being made and would call PBA and meet with Hartenstein and PBA employees to inquire about the status of provider payments.  Hartenstein and PBA employees misled and lied to clients and providers regarding the status of payment of healthcare claims.  D. Donatiello Depo. pp. 98-116 (ECF 425-5); H. Kirby Depo. pp. 143-46 (ECF 425-4) ("I handed her some not so true statements to buy some time."); B. Vest Depo. pp. 30-31 (ECF 425-8) ("[Holly Kirby] would say things like, I'll run a tracer on it, which insinuated that they had mailed the [claim payment], and it must have been lost in the mail."); D. Donatiello Depo. pp. 110-11 (ECF 424-5); T. Davies Depo. pp. 34-37, 44 (ECF 425-6) ("I talked with [Shari Spencer] both about specific claims and about the problem in general. . . . I kept being assured . . . that [the claims checks are mailed as soon as PBA receives the funds]."); E. Thomas Depo. pp. 28-31 (ECF 425-9).  Very disgruntled callers regarding the status of provider payments were referred to by PBA employees as "screamers."

12

(5:10 CV 823)

Plaintiffs were never told that their funds were not used to pay employee healthcare claims, but were used instead by PBA to fund PBA's operations, including employee salaries, car payments, country club memberships, etc.  L. Westfall Depo. pp. 118-19, 140-42 (ECF 425-10).  PBA employees were aware that had Plaintiffs known PBA was not using their funds to pay plan claims, Plaintiffs would not have provided PBA with those funds.  L. Westfall Depo. pp. 140-41 (ECF 425-10).

The problems with PBA's operations snowballed and PBA began to lose clients.  Loss of clients resulted in PBA's increased use of claim funds for its own operations, and the delay in sending out checks for funded claims increased.  Ultimately, PBA entirely ceased using funds received from Plaintiffs to pay claims.

It is undisputed by the parties that PBA did not deposit Plaintiffs' claim money transfer funds into segregated accounts, but deposited the funds into PBA's main account.  It is also undisputed that PBA did not use Plaintiffs' claim money transfer funds to pay Plaintiffs' employees' healthcare claims.  Instead, PBA used those funds to pay its own operating expenses and to pay other client's claims when complaints about unpaid claims could no longer be ignored.

The undisputed evidence in the record reflects that, in addition to Robert Hartenstein, multiple PBA employees were aware of and participated in requesting claim funds from Plaintiffs that they knew would not be used to pay provider claims, depositing Plaintiffs' plan funds in PBA's main account, and deceiving Plaintiffs'and their employees and providers regarding the status of unpaid claims.  Instead of paying Plaintiffs' employees' health care

13

(5:10 CV 823)

claims with Plaintiffs' plan funds, PBA employees used those funds to pay PBA's operational

expenses, which included their own salaries, benefits, and perks at a time when PBA's was

unable to fund its own operations.  Hartenstein and PBA employees sometimes acted

independently, and sometimes in collusion with each other, with respect to the use of Plaintiffs'

plan funds for non-plan purposes.

There is no evidence that PBA's use of Plaintiffs' claim funds for PBA's operations

instead of paying Plaintiffs' employees' claims was unintentional, or an accident or a mistake.

In fact, the record reflects that PBA's employees expressed concerns regarding the deposit of

Plaintiffs' plan funds into PBA's main account and the use of those plan funds to pay for PBA's

operational expenses instead of claims.  L. Westfall Depo. pp. 27-31 (ECF 426-1).

B.    Federal and State Bonding Requirements

As a third-party administrator of Plaintiffs' ERISA plan funds, PBA was required to be

licensed by the State of Ohio, which is governed by Ohio Revised Code Chapter 3959.[15]

PBA was licensed as a third-party administrator since its formation in 1994.  R. Hartenstein

Depo. pp. 20-22 (ECF 425-1).  As part of the annual licensing process, PBA had to show the

_____

[15] R.C. §3959.11, entitled "Written agreement between administrator and plan sponsor; records; ERISA coverage," provides, in pertinent part, as follows:

(A)    No person may act as an administrator without a written agreement between the administrator and the plan sponsor. . .

* * *

(C)    Each administrator duly licensed under *sections 3959.01 to 3959.16 of the Revised Code* shall at all times maintain any required insurance coverage or bond as provided for and mandated by the "Employee Retirement and Income Security Act of 1974," *88 Stat. 829, 29 U.S.C. 1001,* as amended.

14

(5:10 CV 823)

State of Ohio proof of some form of bond or insurance "as provided for and mandated by the "Employee Retirement and Income Security Act of 1974 . . ." *Id.*

ERISA requires every person who handles funds or other property of an ERISA plan to be bonded in order to protect employee benefit plans from risk of loss due to fraud or dishonesty on the part of persons who handle plan funds.  29 U.S.C.S. §1112(a), requires a bond for "[e]very fiduciary of an employee benefit plan and every person who handles funds or other property of such a plan (hereafter in this section referred to as "plan official")."  The bond language is required to "provide protection to the plan against loss by reason of acts of fraud or dishonesty on the part of the plan official, directly or through connivance with others." 29 U.S.C.S. §1112(a) (3)(D).

To fulfill its third-party administrator licensing requirements with the State of Ohio, PBA submitted the Federal Policy to the Ohio Department of Insurance as evidence that PBA had complied with the ERISA bonding requirements.  R. Hartenstein Depo. pp. 75-76 (ECF 425-2); P. Priddy Depo. pp. 222-23 (ECF 425-3).  The Ohio Department of Insurance accepted the Federal Policy as compliant with Ohio's licensure requirement that a third-party administrator at all times maintain any required insurance coverage or bond as provided for and mandated by ERISA.  P. Priddy Depo. p. 222 (ECF 425-3).

Defendant Hartenstein understood the ERISA and contractual bonding requirements to "protect our clients from any acts that Professional Benefits may do that are wrong." R. Hartenstein Depo. p. 22 (ECF 425-1).  PBA obtained what Hartenstein believed to be the

15

(5:10 CV 823)

equivalent of an ERISA bond through modifications to the crime coverage section of the Federal

Policy.  R. Hartenstein Depo. pp. 75-76 (ECF 425-2).


III.  THE INSURANCE POLICIES AND MOTIONS FOR SUMMARY JUDGMENT

There are two separate insurance policies at issue in the parties' cross motions for

summary judgment on the coverage question, a policy issued by Federal and a policy issued by

Gotham.

A.      The Gotham Policy

1.      *The Gotham Policy*

Gotham issued a Miscellaneous Errors and Omissions policy number IA10023709 and

renewals thereof to PBA and Curtis Professional Group[16] (the Gotham Policy).  The Gotham

Policy for the policy period between June 1, 2009 through June 1, 2010 is attached to Gotham's

motion for summary judgment.  ECF 361-3.  The Gotham Policy was in effect on the dates when

Plaintiffs suffered the financial loss for which it received the judgment it now seeks to recover

pursuant to Ohio Revised Code Section 3929.06.

The "Declarations" of the Gotham Policy contains policy limits and describes PBA's

"Professional Services" as "TPA; Sales and Consulting of Employee Benefits."

The Gotham Policy contains the following insuring agreement:

---

[16] Curtis Professional Group is also a defendant in this case, but that aspect of the case
has been stayed in the interest of advancing the core case against PBA.

(5:10 CV 823)

### A.  Covered Services

The Company will pay, on behalf of the Insured, **Damages** and associated **Claim Expenses** arising out of a negligent act, error, or omission resulting in **Claim** for financial loss, **property damage**, **Advertising Liability**, or **Personal Injury**, even if such **Claim** is groundless, false or fraudulent, provided that:

1.  The negligent act, error, or omission took place in the rendering of or the failure to render Professional services; and . . .

ECF 361-3 (emphasis in original).

The Gotham Policy contains the following definitions:

PART III. Definitions
…
**C. Claim** means a written demand for money or services received by the Insured, including service of suit and including declaratory judgment actions or the demand for arbitration proceedings against the Insured.

**D. Claims Expenses** means expenses incurred by the Company or the Insured with the Company's consent, in the investigation, adjustment, negotiation, arbitration, mediations and defense of covered Claims, whether paid by the Company or the Insured with the Company's consent, and include:

1. Attorney's fees; or
2. Costs assessed against the Insured in any **Claim** defended by the Company. . .

**E. Damages** means monetary judgment, award or settlement, except those for which insurance is prohibited by law. **Damages** does not include punitive or exemplary **Damages**, fines, penalties, sanctions, taxes, awards or **Damages** that are multiples of any covered fees, deposits, commissions or charges for goods or services. **Damages** does not include any amounts that represent, or are substantially equivalent to, the return, restitution, disgorgement, forfeiture or rescission of any personal    profit, remuneration or financial advantage, or monies to which an insured was not entitled.
…

**L. Professional services** means those items listed as Professional Services in the Declarations.

17

(5:10 CV 823)

ECF 361-3 (emphasis in original).

**PART II. Exclusions**

This Policy does not apply to any **Claim** or **Claim Expense**:

**A.** Based upon or arising out of any intentional, willful, criminal, fraudulent,
malicious or dishonest act or omission by an Insured; except where the **Claim**
also includes allegations of a negligent act, error or omissions in the performance
of your Professional Services; however, this Policy will not pay any **Damages**
or further **Claim Expenses** in the event of an adjudication or admission by an
insured that the act or omission was intentional, willful, criminal, fraudulent, malicious,
or dishonest.
…

**Q.** Based upon or arising out of the return, restitution, disgorgement, forfeiture
or rescission of any personal profit, remuneration or financial advantage,
or monies to which an insured was not entitled.

The Gotham Policy contains the following Exclusion in Endorsement 6, as pertains to

Third Party Administrators:

This Policy does not apply to any **Claim** or **Claim Expenses**
based upon or arising out of:
…

LL. the commingling, conversion, misappropriation or defalcation
of funds or other property.

ECF 361-3 (emphasis in original).

2.      *Gotham's Motion for Summary Judgment*

Gotham advances five arguments in support of its motion for judgment as a matter of law

that Plaintiffs' judgments against PBA are not covered by the Gotham error and omissions

insurance policy issued to PBA.  Gotham's five arguments have two prongs.  The first prong is

18

(5:10 CV 823)

that Plaintiffs' judgments do not constitute "damages" arising from a "negligent act" under the insuring agreement of the Gotham Policy issued to PBA. The second prong is that even if Plaintiffs' judgments are covered by the insuring agreement, coverage is precluded by three specific policy exclusions.

      a.      *Gotham's five arguments in support of its motion may be summarized as follows:*

      *i.*      The Gotham Policy provides that Gotham will pay on behalf of PBA "Damages" and "Claims Expenses" arising out of a negligent act, error or omission resulting in a claim for financial loss. Under the Gotham Policy, the defined term "Damages" specifically does not include amounts that "represent, or are substantially equivalent to, the return, restitution, disgorgement, forfeiture, or recision of any ... monies to which PBA was not entitled."

      The judgments awarded to Plaintiffs were monies Plaintiffs provided to PBA for payment of Plaintiffs' employees' health care claims pursuant to the plan, but which PBA used instead to pay for operational expenses. Therefore, the judgments awarded to Plaintiffs are for the return of plan monies to which PBA was not entitled, which is specifically excluded from the definition of "damages" in the Gotham Policy.

      *ii.*      Plaintiffs' judgments did not arise out of a "negligent" act, error or omission. PBA knowingly violated its benefits management services agreements with the Plaintiffs when it commingled Plaintiffs' plan funds with its own funds and converted Plaintiffs' plan funds to pay for PBA's operating expenses. Because Plaintiffs' plan damages are the result

19

(5:10 CV 823)

of intentional, not negligent, conduct by PBA, those damages are not covered by the Gotham Policy.

        *iii*.    Exclusion LL,[17] an exclusion applying to third party administrators, excludes any claim "based upon or arising out of the commingling, conversion, misappropriation or defalcation of funds or other property."  Because PBA's commingling and conversion of Plaintiffs' plan funds is the very basis of the plans' damages, those damages are excluded by Exclusion LL.

        *iv*.    Exclusion A[18] excludes claims based upon or arising from an intentional act or omission by the insured.  Because PBA intentionally used Plaintiffs' plan fund for its own purposes rather than to pay the claims of Plaintiffs' plan participants, there is no coverage for those damages.

        *v*.    Exclusion Q[19] excludes claims based upon or arising from the return, restitution, disgorgement, forfeiture or recision of any monies to which PBA was not entitled.

---

[17] The Gotham Policy does not apply to any Claim or Claims Expenses based upon or arising out of: "the commingling, conversion, misappropriation or defalcation of funds or other property."  Exclusion LL (ECF 361-3).

[18] The Gotham Policy does not apply to any Claim or Claims Expenses: "Based upon or arising out of any intentional, willful, criminal, fraudulent, malicious, or dishonest act or omission by an Insured; except where the Claim also includes allegations of a negligent act, error or omission in the performance of your Professional Services; however, this Policy will not pay any Damages or further Claims Expenses in the event of an adjudication or admission by an insured that the act or omission was intentional, willful, criminal, fraudulent, malicious, or dishonest."  Exclusion A (ECF 361-3).

[19] The Gotham Policy does not apply to any Claim or Claims Expenses: "Based upon or arising out of the return, restitution, disgorgement, forfeiture or recision of any personal profit, remuneration or financial advantage, or monies to which an Insured was not entitled."  Exclusion Q (ECF 361-3).

(5:10 CV 823)

Because the judgments against PBA are for employee health care claims that Plaintiffs funded but which PBA never paid, the judgments are for the return of monies to with PBA was not entitled, and therefore excluded under the Gotham Policy.

        b.     *Plaintiffs oppose Gotham's motion for summary judgment on the following grounds*

First, Plaintiffs contend that the judgments that Plaintiffs seek to collect from the Gotham Policy are compensating Plaintiffs' plans for the loss of plan funds, and not the disgorgement or restitution of funds or monies to which PBA was not entitled.  Accordingly, Plaintiffs' conclude that the judgments are covered damages under the insuring agreement.

Second, Plaintiffs' contend that their damages arose from a "negligent act" by PBA. Specifically, Plaintiffs argue that even if PBA's conduct was intentional, coverage under the Gotham Policy is not precluded because "PBA could be found to have intentionally used Plaintiffs' plan funds in negligently carrying out its obligations to Plaintiffs."  Even if Gotham is correct that PBA intentionally commingled funds and used Plaintiffs' plan funds to pay for PBA's operational expenses, Plaintiffs conclude that coverage is still available because "it is also arguable that PBA was so ineptly managed that its activities, though intentional, resulted in loss to its clients."  ECF 426.  In support, Plaintiffs point to Hartenstein's deposition testimony that he was not familiar with the meaning of "commingle" or Ohio's regulations governing third party administrators for the proposition that "[w]hile perhaps incredible, if believed Hartenstein may simply have been completely inept as the owner of a licensed third-party administrator."

Next, Plaintiffs argue that Exclusion LL, which precludes coverage for claims arising from "the commingling, conversion, misappropriation or defalcation of funds," does not negate

(5:10 CV 823)

coverage for Plaintiffs' judgments.  Plaintiffs reason that the evidence reflects that PBA

commingled Plaintiffs' plan funds for years before any loss to its clients, therefore, "[i]t was not

the 'commingling, conversion, misappropriation or defalcation' which caused Plaintiffs' losses

but rather PBA's use of funds earmarked to pay medical and prescription providers for other

purposes. . . . It was not the commingling that caused the shortfalls but rather PBA's

unauthorized use of Plaintiffs' plan funds."  ECF 426 at pp. 9-10.

     Fourth, Plaintiffs contend that Exclusion A does not preclude coverage because while

Exclusion A excludes coverage for claims based upon or arising out of "any intentional, willful,

criminal, fraudulent, malicious or dishonest act or omission by an Insured" the exclusion

contains an exception "where the Claim also includes allegations of a negligent act . . . in the

performance of your Professional Services . . . however, this Policy will not pay any Damages . .

. in the event of an adjudication or admission by an insured that the act . . . was intentional,

willful, criminal, fraudulent, malicious, or dishonest."  Plaintiff points out that the underlying

complaints contain allegations of negligence, and that while "[t]he evidence in the case clearly

shows that PBA's employees acted intentionally throughout . . . there has been no adjudication

as to whether PBA's acts falls within the exclusion."  ECF 426 at p. 11

     Fifth and last, Plaintiffs argue that Exclusion Q does not exclude coverage because PBA

was entitled to receive the funds at issue from Plaintiffs in order to pay provider claims.  Plaintiff

reasons that Exclusion Q does not cover scenarios such as this where "PBA abused its

entitlement to the funds by using them for unauthorized purposes."  ECF 426 at p. 11.

22

(5:10 CV 823)

    3.    *Plaintiffs' Motion for Summary Judgment on the Gotham Policy*

Plaintiffs' arguments in support of their motion for summary judgment on their

Supplemental Complaints for coverage under the Gotham Policy, and Gotham's opposition to

Plaintiffs' motion, essentially mirror the parties' arguments with respect to Gotham's motion for

judgment that, as a matter of law, there is no coverage under the Gotham Policy with respect to

Plaintiffs' Supplemental Complaints.

B.    <u>The Federal Policy</u>

    1.    *Federal Policy*

Federal issued ForeFront Portfolio Policy No. 8210-0215 to Professional Benefits

Administrators, Inc., and renewals thereof  (the "Federal Policy").  The most recent renewal

covers for the policy period from April 15, 2010 to April 15, 2011.[20]  ECF 443-1. The Federal

Policy was in effect on the dates when Plaintiffs suffered the financial losses which they now

seek to recover from the Federal Policy pursuant to Ohio Revised Code Section 3929.06.

The Crime Coverage section of the Federal Policy includes the following "Insuring

Clauses":[21]

> (A) **Employee Theft Coverage**
> The **Company** shall pay the **Parent Corporation** for direct loss sustained
> by an **Insured** resulting from **Theft** or **Forgery** committed by an
> **Employee** acting alone or in collusion with others. (Emphasis in original).
>
>     \*\*\*
> (I) **Client Coverage**
> The **Company** shall pay the **Parent Organization** for direct loss

---

[20] Prior coverage for Policy No. 8210-0215 was April 15, 2009 - April 15, 2010.

[21] ECF 443-1 pp. 28-29 of 47.

(5:10 CV 823)

sustained by a **Client** resulting from **Theft** or **Forgery** committed by an **Employee** not in collusion with such **Client**'s employees.  (Emphasis in the original).

"Collusion" is not defined by the Federal Policy.[22]

Section III of the Crime Coverage section of the Federal Policy covers exclusions.

Excluded from coverage is:[23]

. . .
 (A) (15) loss due to the unlawful taking of **Money**. . . or any other fraudulent, dishonest, or criminal act (other than **Robbery** or **Safe Burglary**), by an authorized representative of the **Insured Organization**, other than an **Employee**, provided that such authorized representative is not acting in collusion with any **Employee.**  (Emphasis in original).

The term 'authorized representative' is not defined by the Federal Policy.

"Client" is defined in the Federal Policy as:[24] "a customer of an **Insured Organization** to whom the **Insured Organization** provides goods or services under written contract or for a fee."

"Theft" is defined in the Federal Policy as:[25] "the unlawful taking of **Money**, **Securities**, or **Property** to the deprivation of (1) an **Insured**, solely for the purpose of Insuring Clause (A); or (2) a **Client**, solely for the purposes of Insuring Clause (I)."  (Emphasis in the original).

---

[22] The unabridged Merriam-Webster dictionary defines collusion as a secret agreement/cooperation for a fraudulent or deceitful purpose.

[23] ECF 443-1 p. 33 of 47.

[24] ECF 443-1 pp. 23 of 47 (emphasis in original).

[25] ECF 443-1 pp. 33 and 43 of 47.  The language of paragraph 3 of the Federal Policy definition of "Employee" is found in Endorsement/Rider No. 2 - "Pension Protection Act Enhancement Endorsement."

(5:10 CV 823)

"Employee" is defined in the Federal Policy as any:[26]

> (1) natural person in the regular service of an **Insured Organization** in the ordinary course of such **Insured Organization's** business, whom such **Insured Organization** governs and directs in the performance of such service, including any part-time, seasonal, leased and temporary employees as well as volunteers;
>
> (2) **Executive** while performing acts within the scope of the usual duties of an **Employee**; or
>
> (3) natural person fiduciary, trustee, administrator or **Employee** of a **Sponsored Plan** and any other natural person who handles ERISA plan assets, whether or not required to be bonded in connection with such **Sponsored Plan** by Title 1 of the Employee Retirement Income Security Act of 1974, as amended and the Pension Protection Act of 2006.  (Emphasis in original).

The Federal Policy includes directors, officers and members of the Board in the definition of Executive.[27]  The definition of Employee includes Executives who are performing acts within the scope of the usual duties of an Employee.

"Sponsored Plan" is defined in the Federal Policy as:[28]

---

[26] ECF 443-1 p. 31 of 47 (emphasis in original).

[27] "Executive" is defined in the Federal Policy as any natural person:

> (1) duly elected or appointed directors, officers, members of the Board of Managers or Management committee members of any **Insured Organization** incorporated in the United States of America;
> * * *

ECF 443-1 p. 31 of 47 (emphasis in original).

[28] ECF 443-1 pp. 33 and 43 of 47.  The language of paragraph 2 of the Federal Policy definition of "Sponsored Plan" is found in Endorsement/Rider No. 2 - "Pension Protection Act Enhancement Endorsement." (Emphasis in original).

(5:10 CV 823)

(1) any Employee Benefit Plan, Pension Benefit Plan, Welfare Benefit Plan, as each are defined in the Employee Retirement Income Security Act of 1974, as amended, which is operated solely by the **Insured Organization** or jointly by the **Insured Organization** and a labor organization for the benefit of the **Employees** of the **Insured Organization** located anywhere in the world and which existed on or before the inception of this Coverage Section or which is created or acquired after the inception of this Coverage Section;

(2) any other employee benefit plan or program not subject to Title 1 of the Employee Retirement Income Security act of 1974, as amended, or the Pension Protection act of 2006, sponsored solely by the **Insured Organization** for the benefit of the **Employees**, including any excess benefit plan located anywhere in the world and which existed on or before the inception of this Coverage Section or which is created or acquired after the inception of this Coverage Section; or

(3) any other plan, fund, or program specifically included as a **Sponsored Plan** by endorsement to this Coverage Section.

2.      *Federal's Motion for Summary Judgment*

Federal asserts that is entitled to judgment as a matter of law that there is no coverage under the Federal Policy for Plaintiffs' judgments because there was no "theft" by an "employee" under the Federal Policy language.  Federal advances the following arguments in support of this position.

First, Federal argues that no employee actually took Plaintiffs' plan funds, diverted those funds to their own account, embezzled plan money, created false invoices or overcharged Plaintiffs.  Rather, PBA followed a "general business practice" of depositing Plaintiffs' plan funds into its own general operating account, delaying payment of Plaintiffs' claims payments, and using Plaintffs' funds for PBA's own operations.  Federal therefore concludes that Plaintiffs'

26

(5:10 CV 823)

losses were due to PBA's general business practices, and do not constitute "theft" by an "employee."

Next, it is Federal's position that PBA's Robert Hartenstein directed PBA's general business practice of using Plaintiffs' claim funds for PBA's operations, including car leases and country club memberships. Federal argues that Hartenstein, as the chairman of the board, officer and majority owner of PBA, is not an employee within the meaning of the Federal Policy, which defines "employee" as a person which PBA "governs and directs," citing *Lutz v. St. Paul Fire & Marine Insurance Co.*, 2005 WL 2372871 (S.D. Ohio) in support.[29] PBA did not "govern and direct" Hartenstein, rather it was Hartenstein that governed and directed PBA. Therefore, Federal concludes that Plaintiffs' losses do not constitute "theft" by an "employee" because Hartenstein was not an "employee" as defined by the Federal Policy.

---

[29] In *Lutz*, Chief Judge Beckwith stated that there is "widespread support for the proposition that a person who either dominates a corporation or is the corporation's alter ego is not an 'employee' as a matter of law where the policy defines 'employee' as a person whom the insured has the right to direct and control. . . . The common thread between the dominate shareholder theory and the alter ego theory is that if one person exercises complete control over the corporation, his acts are the corporation's acts. Thus there is no coverage because commercial crime policies were not designed to protect corporations from their own dishonest acts . . ." *Lutz*, 2005 WL 2372871 at *4. Noting that the Supreme Court of Ohio has not specifically addressed the issue of whether a dominate shareholder is an "employee" under a commercial crime insurance policy, Chief Judge Beckwith concluded that if the Ohio Supreme Court faced that issue it would endorse application of "the dominate shareholder rule." Chief Judge Beckwith based this conclusion on three reasons. First, the Supreme Court of Ohio already determined that an insurance company is not liable under a commercial crime insurance policy where the defalcator is the alter ego of the corporation because the acts of the alter ego are the acts of the corporation and the wrongful acts of the corporation are not covered under the policy as the insured. Second, the Supreme Court of Ohio has held that it is contrary to public policy to insure against one's own intentional acts. Third, the dominate shareholder rule is the majority rule.

(5:10 CV 823)

Third, Federal argues that the Federal Policy protects PBA and PBA's clients against PBA'a employees dishonest acts, not against the dishonest acts or intentional wrongdoing of PBA itself.  Because Plaintiffs' losses were not do to the conduct of employees as defined by the Federal Policy, but by PBA's own practices, those losses are not covered by the Federal Policy.

Plaintiffs oppose Federal's motion on the following grounds.

First, Plaintiffs dispute Federal's contention that there was no "theft" because the loss of plan funds occurred as a result of PBA's business practices and no employee actually took the money and placed it in his or her own pocket.  Plaintiffs point out that ERISA bonding requirements covers all fraud and dishonesty and does not require personal gain or criminal conduct,[30] and that the Federal Policy was obtained by PBA to satisfy federal and Ohio's TPA licensing requirements and should be construed to provide coverage for conduct that falls within those requirements.

Citing *Titan Industrial Corp. v. Federal Insurance Co.,* 1998 U.S. Dist. LEXIS 23650 (S.D.N.Y. 1998), Plaintiffs also argue that other courts considering the same definition of theft contained in the Federal Policy have turned to state law on theft and larceny to inform their interpretation of policy coverage.  Plaintiffs advance for the Court's consideration Ohio's definition of theft under Ohio Revised Code Section 2913.02 to find coverage for theft under the

---

[30] In support, Plaintiffs quote 29 C.F.R. § 2580.412-9: "ERISA bonds for theft and dishonesty 'provide recovery for loss occasioned by such acts even though the person committing the act is not subject to punishment as a crime or misdemeanor, provided that within the law of the state in which the act is committed, a court would afford recovery under a bond providing protection against fraud or dishonesty.'"

(5:10 CV 823)

Federal Policy because PBA deprived Plaintiffs of the funds by knowingly exerting control over Plaintiffs' plan funds in a manner that Plaintiffs did not consent to, and did so by deception.

Plaintiffs also dispute Federal's position that Hartenstein is the only individual at PBA that committed "theft" and that Hartenstein's conduct is not covered by the Federal Policy because he is the "alter ego" of PBA. Even if Hartenstein is not governed and controlled by PBA, Plaintiffs argue that a number of individuals at PBA who were governed and controlled by PBA actively participated in the theft of Plaintiffs' ERISA funds, and those individuals are "employees" as defined by the Federal Policy. Lastly, even if Hartenstein is PBA's alter ego, PBA would not be recovering under the policy for its own wrongdoing because the "Client Coverage" insuring clause of the Federal Policy benefits Plaintiffs, and not PBA.

3.      *Plaintiffs' Motion for Summary Judgment on the Federal Policy*

Plaintiffs' motion for summary judgment on their Supplemental Complaints for coverage under the Federal Policy, and Federal's opposition to Plaintiffs' motion, essentially mirror the parties' arguments with respect to Federal's motion for judgment as a matter of law that there is no coverage under the Federal Policy with respect to Plaintiffs' Supplemental Complaints.


## IV.  APPLICABLE LAW

A.      <u>Summary Judgment Standard</u>

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of advising the Court of the basis

29

(5:10 CV 823)

for its motion and identifying the portions of the record which the movant believes demonstrates the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the opposing party must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The opposing party cannot merely rest on its pleadings or reassert previous allegations, but must go beyond the pleadings and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324.

When considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 396 U.S. 654, 655 (1962). The Court may not weigh the evidence and make findings of fact. The purpose of summary judgment is not to resolve factual issues but to determine if there is a need for a trial because there are genuine disputes as to material facts that can only be resolved by a factfinder because they may reasonably be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250.

The standard of review for cross motions for summary judgment is the same. Cross motions for summary judgment do not mean that the Court must grant summary judgment for one side or the other. Each motion must be evaluated on its own merits. *Werner v. Progressive Preferred Ins.*, 533 F.Supp.2d 776, 780 (N.D. Ohio 2008) (citing *Taft Broad. Co. v. U.S.*, 929 F.2d 240, 248 (6th Cir. 1991); *Kennedy v. City of Zanesville*, 505 F.Supp.2d 456, 477 (S.D. Ohio 2007).

(5:10 CV 823)

B.    Ohio Rev. Code Section 3929.06

Plaintiffs' Supplemental Complaints against Gotham and Federal are brought pursuant to

Ohio Revised Code Section 3929.06, which provides:

> **3929.06    Liability insurance applied to satisfaction of final judgment; supplemental complaint; coverage defenses**
>
> (A)(1) If a court in a civil action enters a final judgment that awards damages to a plaintiff for injury, death, or loss to the person or property of the plaintiff or another person for whom the plaintiff is a legal representative and if, at the time that the cause of action accrued against the judgment debtor, the judgment debtor was insured against liability for that injury, death, or loss, the plaintiff or the plaintiff's successor in interest is entitled as judgment creditor to have an amount up to the remaining limit of liability coverage provided in the judgment debtor's policy of liability insurance applied to the satisfaction of the final judgment.
>
> (2) If, within thirty days after the entry of the final judgment referred to in division (A)(1) of this section, the insurer that issued the policy of liability insurance has not paid the judgment creditor an amount equal to the remaining limit of liability coverage provided in that policy, the judgment creditor may file in the court that entered the final judgment a supplemental complaint against the insurer seeking the entry of a judgment ordering the insurer to pay the judgment creditor the requisite amount. Subject to division (C) of this section, the civil action based on the supplemental complaint shall proceed against the insurer in the same manner as the original civil action against the judgment debtor.

"Section 3929.06 creates a subrogation action, wherein the injured party stands in the

shoes of the insured against his or her insurer . . ." *Elkins v. American International Special*

*Lines Ins. Co.*, 611 F.Supp.2d 752, 758 (S.D. Ohio 2009).  Under Ohio law, the rights of the

judgment creditor to collect under an insurance policy pursuant to Section 3929.06 is not greater

than the that of the insured, and the insurer may raise any defenses it may have had against the

insured in an action under Section 3929.06.  *Nixon v. Medmarc Cas. Ins. Co.*, 2010 WL 4255916

31

(5:10 CV 823)

at * 2 (N.D. Ohio) (quoting *Walker v. Buck*, 86 Ohio App. 3d 846, 848-49 (Ohio App. 9 Dist. 1993)).

C.      Determining Coverage Under Ohio Law[31]

The two insurance policies at issue are construed pursuant to Ohio law.  Plaintiffs acknowledge that under Ohio law, the party seeking to recover under an insurance policy bears the burden of demonstrating coverage under the policy as well as proving a loss.[32]  As discussed below, policy language susceptible of more than one interpretation is construed against the insurer and in favor the insured.  In order to defeat coverage, the insurer must establish not merely that the policy can be construed in the manner it favors, but that the insurer's construction is the only one that can fairly be placed on the language in question.  *Anderson v. Highland House Company*, 93 Ohio St. 3d 547, 549 (2001).

Under Ohio law, an insurance policy is a contract and the interpretation and construction of insurance policies is determined by the rules of construction and interpretation applicable to contracts generally.  Undefined words in an insurance contract are to be given their plain and ordinary meaning.  *Twin Maples Veterinary Hospital, Inc. v. Cincinnati Insurance Co.*, 159 Ohio App. 3d 590, 596 (2005) (quoting *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St. 3d 107, 108 (1995)).  "The Court must reasonably interpret an insurance contract in

---

[31] The policies do not contain a choice of law provision.  Ohio law applies to the construction of the insurance contracts at issue.  *See Ohayon v. Safeco Insurance Co. of Illinois*, 91 Ohio St. 2d, 474, 477-81 (2001).

[32] Plaintiffs' Brief in Opposition to Gotham's Motion for Summary Judgment at p. 6, citing *Chicago Title Ins. Co. v. Huntington Nat'l Bank*, 87 Ohio St. 3d 270, 273 (1999). ECF 426.

(5:10 CV 823)

conformity with the parties's intentions as gathered from the ordinary and commonly understood meaning of the language employed." *Werner v. Progressive Preferred Ins.*, 533 F.Supp.2d at 781 (internal quotations omitted) (quoting *Brooks v. All American Ins. Co.*, 2002 WL 31718868, *2 (Ohio App.) (quoting *Dealers Dairy Prod. Co. v. Royal Ins. Co.*, 170 Ohio St. 336, 339 (1960))); *Safeco Insurance Co. v. White*, 122 Ohio St. 3d 562, 566-67 (2009) ("[O]ur task when interpreting an insurance policy is to examine the insurance contract as a whole and presume that the intent of the parties is reflected in the language used in the policy . . . we look to the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy." (internal quotations and citations omitted) (quoting *Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d 216, 219 (2003)); *Whitt Machine Inc. v. Essex Insurance Co.*, 377 Fed. Appx. 492, 496 (6th Cir. 2010) (citing *Gomolka v. State Auto. Mut. Ins. Co.,* 70 Ohio St. 2d 166 (1982) (intent of the parties must be determined from the instrument as a whole, not detached or isolated parts thereof)).

If an insurance policy's terms are clear and unambiguous, the Court may look no further than policy itself to determine the intent of the parties and their rights and obligations.  A contract is unambiguous if it can be given a definite legal meaning.  *Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d at 219; *Honeybaked Foods, Inc. v. Affiliated FM Ins. Co.*, 757 F.Supp.2d 738, 745 (N.D. Ohio 2010).  However, if the policy language is ambiguous - that is, reasonably susceptible to more than one interpretation - the court may consider extrinsic evidence to determine the intent of the parties.  *Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d at 219 (citing *Shifrin v. Forest City Enterprises, Inc.*, 64 Ohio St. 3d 635 (1992)).  However, the court may not

33

(5:10 CV 823)

alter the insurance contract by imputing an intent contrary to that expressed by the parties.

*Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d at 219-20.

Generally, it is the role of a fact finder to resolve an ambiguity.  However, where the

written contract is standardized, as in the insurance contract when the insurer customarily

prepares the contract, an ambiguity in contract language is ordinarily construed in favor of the

insured and against the insurer.  *Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d at 219-20; *Werner*

*v. Progressive Preferred Ins.*, 533 F.Supp.2d at 781; *Honeybaked Foods, Inc. v. Affiliated FM*

*Ins. Co.*, 757 F.Supp.2d at 745 (If insurance contract provisions are reasonably susceptible to

more than one interpretation, those provisions are construed strictly against the insurer and

liberally in favor of the insured.).

An insurance policy reasonably open to different interpretations will generally be

construed in favor of the insured.  However, that rule will not be applied to reach an

unreasonable interpretation of the policy.  *Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d at 220

(quoting *Morfoot v. Stake*, 174 Ohio St. 506 (1963)).  "Ohio law appears to accept that an

ambiguous phrase should be interpreted in accordance with how a reasonable policyholder

would understand the language. . . ."  *St. Marys Foundry, Inc. v. Employers Insurance of*

*Wausau,* 332 F.3d 989, 997 fn. 5 (6th Cir. 2003).

However, interpreting an ambiguous phrase in accordance with how a reasonable policy

holder would understand the language does not mean that courts must effectuate a policy

holder's "reasonable expectations" concerning coverage regardless of language.  *Id.*  In some

jurisdictions insurance contracts can be interpreted by taking into account the "reasonable

34

(5:10 CV 823)

expectations" of the insured despite the fact that policy language may negate such expectations. However, the "reasonable expectations doctrine" has not been adopted by the Ohio Supreme Court. *Whitt Machine Inc. v. Essex Insurance Co.*, 377 Fed. Appx. 492, 496 fn. 1 (6th Cir. 2010) (citing *Wallace v. Balint*, 94 Ohio St. 3d 182, 189 (2002) (noting that "there is not yet a majority on this court willing to accept the reasonable-expectations doctrine")).[33]

### V.  ANALYSIS

A.    Federal Policy

Both Federal's and Plaintiffs' motions for summary judgment regarding coverage under the Federal Policy with respect to Plaintiffs' Supplemental Complaints require the Court to interpret the Federal Policy to determine coverage.  The arguments advanced by both sides in support of their motions for judgment as a matter of law regarding coverage of the Federal Policy mirror their arguments advanced in opposition to the others motion.  Consequently, there

---

[33]      In *Honeybaked Foods, Inc. v. Affiliated FM Insurance Co.,* 757 F.Supp.2d 738, 750-52 (N.D. Ohio 2010), Judge Carr recognized that the question of whether Ohio law will recognize the reasonable expectations doctrine was a question not yet answered by the Ohio Supreme Court, and certified the following question to the Ohio Supreme Court:

> In light of the Supreme Court of Ohio's opinion in *Anderson v. Highland House Co.*, 93 Ohio St. 3d 547 (2001), does the reasonable-expectations doctrine apply to a commercial general liability "all-risk" insurance policy, so that coverage, which otherwise would be excluded under the terms and conditions of the policy, is afforded, provided the trier of fact determines that the insured reasonably expected, when purchasing the policy, that the policy would cover the loss at issue.

However, the Ohio Supreme Court declined to answer the certified question.  See NDOH Case No. 3:08 CV 1686, ECF 57 and 60).  The parties in *Honeybaked Foods* ultimately settled the case.

35

(5:10 CV 823)

is no need to separately analyze Plaintiffs' and Federal's motions for judgment as a matter of law

regarding coverage of the Federal Policy as to Plaintiffs' Supplemental Complaints.

The relevant underlying facts of this case are essentially undisputed.  However, the

parties dispute whether those underlying facts support coverage under the Federal Policy.  The

core issue presented by Plaintiffs' and Federal's motions for summary judgment is whether the

relevant undisputed facts constitute "theft" by an "employee" under the client coverage insuring

clause of the Federal Policy.

The client coverage insuring clause provides:

(I) **Client Coverage**

> The **Company** shall pay the **Parent Organization** for direct loss
> sustained by a **Client** resulting from **Theft** or **Forgery** committed by an
> **Employee** not in collusion with such **Client**'s employees.  (Emphasis in the
> original).

1.  *Plaintiffs are Clients within the meaning of the Federal Policy*

"Client" is a defined term in the Federal Policy.  There is no dispute that the Plaintiffs'

were clients of PBA.  All the Plaintiffs were customers of PBA, and, pursuant to an agreement

for a fee, PBA provided Plaintiffs with third-party administrative services with respect to

Plaintiffs' self-insured ERISA plans.

2.  *Plaintiffs sustained direct losses within the meaning of the Federal Policy*

"Direct loss" is not defined by the Federal Policy.  In granting partial summary judgment

in favor of Plaintiffs and against PBA, the Court previously determined that Plaintiffs loss of

plan funds were caused by PBA's breach of its ERISA fiduciary duty to Plaintiffs.  After

36

(5:10 CV 823)

discovering that their plan funds were not used by PBA to pay Plaintiffs' healthcare provider claims, Plaintiffs expended additional funds to pay employees' claims under their respective plans.

Further, the Sixth Circuit recently affirmed a district court's determination that the Ohio Supreme Court would apply a proximate cause standard in construing an insurance policy to determine if plaintiffs sustained a loss "resulting directly from" the "theft of Insured property by Computer Fraud." *Retail Ventures, Inc. v. National Union Fire Insurance Company of Pittsburgh, PA.*, 691 F.3d 821, 830-33 (6th Cir. 2012); *see also First Defiance Financial Corporation v. Progressive Casualty Insurance Company*, 688 F.Supp.2d 703, 708 (N.D. Ohio 2010).  In this case, Plaintiffs' loss of plan funds to pay Plaintiffs' employees' healthcare claims was both literally and proximately caused by PBA's use of Plaintiffs' plan funds for operational expenses rather than for claim payment.

The Court therefore concludes that there is no genuine dispute that the money damages awarded by the Court in granting partial summary judgment to Plaintiffs against PBA constitute a "direct loss" to a client within the meaning of the Federal Policy.

3.  *Plaintiffs' direct losses resulted from theft by
        PBA employees within the meaning of the Federal Policy*

The core question for the Court's interpretation of the coverage of the Federal Policy is whether Plaintiffs' losses resulted from theft by a PBA employee.  Federal contends that Plaintiffs' losses do not constitute theft because Plaintiffs' plan funds were not embezzled or otherwise taken or used by an employee for that employee's personal gain.  Even if Plaintiffs' losses do constitute theft within the meaning of the Federal Policy, Federal argues that those

37

(5:10 CV 823)

losses are still not covered by the Federal Policy because the theft was not committed by a PBA

employee as defined by the policy.

Under Ohio law, the Court must examine the entire insurance policy when construing

coverage and assume the parties' intent is reflected in the language of the policy.  Consideration

of language of the entire policy includes consideration of exclusionary language.  While

exclusionary language may not be used to create new coverage, exclusionary language may be

used to interpret a policy's insuring language.  *First Defiance Financial Corporation v.*

*Progressive Casualty Insurance Company*, 688 F.Supp.2d at 707 ("*Blake* [*v. Thronton*, 182 Ohio

App. 3d 716 (2009)] does not hold that a court may not look to exclusion language to *interpret*

the insuring language.  In fact, *Blake* reaffirms the uncontroversial proposition that a court

should 'examine the insurance contract as a whole and presume the intent of the parties is

reflected in the language used in the policy.' [citation omitted]  Therefore, examining the

exclusion language in the [insurance policy] in order to better interpret the 'direct loss' provision

is a proper, and indeed required, inquiry for this Court.").

When policy language is susceptible of more than one interpretation, the language will be

construed against Federal and take into account how a reasonable policy holder would

understand the language and the intent of the parties.  However, consideration of a reasonable

policyholder's understanding of policy language cannot be applied to create new coverage.

38

(5:10 CV 823)

a.      *Plaintiffs' losses constitute "theft" under the Federal Policy*

With respect to the Client Coverage insuring clause, "theft" is defined by the Federal

Policy as "the unlawful taking of Money . . . to the deprivation of . . . a Client, solely for the

purposes of [the Client Coverage Insuring Clause]."  It is Federal's position that while PBA's

employees may have been dishonest with Plaintiffs about the use of Plaintiffs' plan funds, and

Plaintiffs' plan funds were lost as a consequence, there has been no theft under the Federal

Policy because no PBA employee took Plaintiffs' money for their own benefit, but instead used

the money for PBA's operations in accordance with PBA's operational practices.

The Federal Policy defines theft as an "unlawful taking."  However, the Federal Policy

does not define "unlawful" or "taking," which may be susceptible to more than one

interpretation.  The unabridged Merriam Webster dictionary defines "unlawful" as: not lawful;

contrary to or prohibited by law; not authorized or justified by law; not permitted or warranted

by law.  The unabridged Merriam Webster dictionary defines "taking" as: to get into one's hands

or into one's possession, power or control by force or strategem; to transfer into one's own

keeping; to enter into or arrange for possession, ownership or use of.

The dictionary definition of "unlawful" - not lawful; contrary to or prohibited by law -

points the Court toward the definition of theft in Ohio's criminal code for assistance in

construing the Federal Policy as to the meaning of "unlawful" in the definition of theft.  Other

courts have turned to the applicable criminal code for help in interpreting the meaning of "theft"

in policy language.  *See Hartford Fire Ins. Co. v. Mitchell Co., Inc.*, 2010 WL 5239246 at fn. 6

(S.D. Ala.) ("'While definitions under the criminal law are some authority and can serve as a

39

(5:10 CV 823)

guide to interpretation, such definitions are not controlling for the purposes of construing

language found in an insurance policy.' [citation omitted].").  In *Titan Industrial Corp. v.*

*Federal Insurance Co.,*[34] the district court in New York examined the New York law of theft for

assistance in construing the same definition of theft in a Federal policy now before this Court,

concluding that:

> In view of New York law of theft and larceny, the Court finds that Federal cannot
> meet its burden of establishing that there is no reasonable construction of the term
> "theft" and its definition as an "unlawful taking" in the context of a crime
> insurance policy that includes theft perpetrated by false pretense.  Thus the Court
> finds that the term "theft" and its definition in the Insurance Policy includes the
> possibility of coverage for theft perpetrated by false pretenses.

Ohio Revised Code Section 2913.02 describes "theft" in the following manner:

> (A) No person, with purpose to deprive the owner of property or
> services, shall knowingly obtain or exert control over either the
> property or services in any of the following ways:
>
> > (1) Without the consent of the owner or person authorized to
> > give consent;
> >
> > (2) Beyond the scope of the express or implied consent of the
> > owner or person authorized to give consent;
> >
> > (3) By deception;
> > * * *

Also helpful in interpreting the meaning of "theft" in the Federal Policy is the Federal

Policy's exclusionary language found at Section III from the Crime Coverage section of the

Federal Policy.  This language, which certain exceptions, excludes from coverage the unlawful

taking of money by an authorized representative who is not an employee, and provides:

_____

[34] *Titan Industrial Corp. v. Federal Insurance Co.,* 1998 U.S. Dist. LEXIS 23650
(S.D.N.Y. 1998).

40

(5:10 CV 823)

> No coverage will be available under this [Crime] Coverage Section for:
> . . .
>  (A) (15) loss due to the *unlawful taking of* **Money**. . . *or any other fraudulent, dishonest, or criminal act* (other than **Robbery** or **Safe Burglary**), by an authorized representative of the **Insured Organization**, other than an **Employee**, provided that such authorized representative is not acting in collusion with any **Employee.**  (Bold emphasis in original; Italicized emphasis added).

The language of this exclusion speaks in terms of an "unlawful taking," which is the phrase used by the Federal Policy to define "theft."  In the exclusion, the Federal Policy definition of "theft" - "unlawful taking" - is immediately followed by the conjunctive phrase: "or any other fraudulent, dishonest or criminal act . . . ."

The conjunctive "or" can be used in several ways.  In the exclusion, the conjunctive phrase "or any other" explains and equates an "unlawful taking" with a "fraudulent, dishonest or criminal act."  If the conjunctive "or" were used alone, that would suggest that fraudulent, dishonest and criminal acts were alternate acts, rather than equivalent acts, to "unlawful taking." That is: "loss due to the *unlawful taking* of Money. . . *or any other fraudulent, dishonest, or criminal act* . . . by an authorized representative" versus "loss due to the *unlawful taking* of Money. . . *or fraudulent, dishonest, or criminal act* . . . by an authorized representative."

While exclusionary language cannot be used to create coverage, it can be used as a tool in interpreting the insuring clauses to determine the intent of the parties.  The structure of this exclusionary language equates and explains "theft" - i.e. an "unlawful taking" - as a fraudulent, dishonest or criminal act.

There is no language in the Federal Policy which limits "theft" to the concept of embezzlement or like conduct, or which excludes fraudulent or dishonest conduct resulting in the

41

(5:10 CV 823)

loss of Client funds.  The words used in the Federal Policy's definition of theft - "unlawful taking" - are not defined by the Federal Policy and can be subject to different interpretations.

After examining the Federal Policy as a whole, and considering the dictionary definition of "unlawful" and "taking," the language of Ohio's criminal code, and the structure of exclusionary language to assist the Court in determining the parties' intent, and resolving ambiguities against Federal, the Court finds that term "theft" in the Federal Policy is not limited to embezzlement and like conduct, but includes fraudulent, dishonest or criminal conduct.

In this case, the use of Plaintiffs' plan funds for PBA's operations was a deliberate exercise of possession and control over Plaintiffs' plan funds by PBA's employees, without Plaintiff's consent, which deprived Plaintiffs of plan funds for the payment of employee health care claims.  PBA's operations included payment of employee salaries, benefits and perks. Further, PBA's employees obtained these funds by deceiving Plaintiffs into believing that Plaintiffs' plan funds were being requested and used for payment of employee healthcare claims, knowing all the while that those funds were not used for claim payment but to pay the salaries of the PBA employees and other operational expenses.  Federal essentially concedes that PBA employees were dishonest in their handling of Plaintiffs' plan funds, but argues that such dishonesty is not theft within the meaning of the Federal Policy.

Accordingly, the Court concludes that the judgments upon which Plaintiffs seek to collect from Federal pursuant to Ohio Revised Code Section 3929.06 resulted from "theft" as defined by the Federal Policy.

42

(5:10 CV 823)

   b.  *Theft of Plaintiffs' plan funds was committed by PBA Employees*

  The Court has interpreted the Federal Policy and concluded that PBA's use of Plaintiffs'

plan funds for its own operations under the facts of this case constitutes "theft" within the

meaning of the Federal Policy.  However, the Client Coverage insuring clause is not triggered

unless the theft is committed by an "Employee."

  Federal contends that there was no theft by an "Employee" as defined by the Federal

Policy because use of Plaintiffs' plan funds for PBA's operations was determined and directed

by PBA's owner Robert Hartenstein.  As an owner, director, and officer, Federal contends that

Hartenstein was not "governed and controlled" by PBA, and therefore not an Employee within

the meaning of the Federal Policy.

   i. *Acts of multiple PBA employees resulted in theft of Plaintiffs' plan funds*

  The term "Employee" is defined by the Federal Policy as an individual working in the

service of PBA's business who is governed and controlled by PBA.  The record before the Court

is replete with evidence that multiple employees of PBA, who were undisputedly governed and

controlled by PBA, engaged in conduct which constituted theft of Plaintiffs' plan funds as

defined by the Federal Policy.  Contrary to Federal's contentions that Hartenstein unilaterally

controlled PBA's affairs, PBA employees other than Hartenstein worked independently and

collaboratively, with Hartenstein and with each other, to control and deprive Plaintiffs of plan

funds without their consent, all the while deceiving Plaintiffs and providers regarding the status

of claims payment.  These PBA employees include Linda Westfall, Shari Spencer, and Holly

Kirby.

(5:10 CV 823)

While these PBA employees sometimes sought out Hartenstein for input or certain decisions, it is without dispute that these employees had the discretion to make independent and collective decisions with respect to the accounts into which Plaintiffs' plan funds were deposited and whether Plaintiffs' plan funds were used to pay claims or for PBA's operations.  Further, it is undisputed that these PBA employees deliberately provided Plaintiffs with false and misleading information regarding the status of claim payment , and that Plaintiffs' continued to provide PBA with plan funds that PBA employees knew would not be used to pay claims, but used instead for PBA's operations, including payment of PBA employees' salaries, benefits, and perks.

> ii.  *Collusion of PBA employees constitutes theft of Plaintiffs' plan funds*

Additionally, even if Federal is correct that Hartenstein is not an Employee as defined by the Federal Policy, the record consistently reflects that Hartenstein colluded with PBA employees in the theft of Plaintiffs' plan funds.

The following exclusion has already been considered in connection with the meaning of "theft" and provides:

> No coverage will be available under this [Crime] Coverage Section for:
> . . .
>  (A) (15) loss due to the unlawful taking of Money. . . or any other fraudulent, dishonest, or criminal act (other than Robbery or Safe Burglary), by an authorized representative of the **Insured Organization**, other than an **Employee**, *provided that such authorized representative is not acting in collusion with any **Employee**.*  (Bold emphasis in original; Italicized emphasis added).

The language excludes from coverage theft by an "authorized representative" who is also not an "Employee" as defined by the Federal Policy.  The term "authorized representative" is not

44

(5:10 CV 823)

defined by the Policy.  However, the benefits services agreements between PBA and Plaintiffs were signed by the president of PBA as its authorized representative.  Hartenstein was a director, officer, and de-facto president of PBA.  There is no genuine dispute that Hartenstein was an authorized representative of PBA, and the Court concludes the same.

Therefore, theft by Hartenstein (assuming he was not also acting as an Employee) would be excluded from coverage "provided that such authorized representative was not acting in collusion with any [PBA] employee."  The language of this exclusion supports an interpretation of "theft by an employee" that includes collusive acts of theft by PBA employees with authorized representatives, and there is no dispute in the record that PBA employees acted in collusion with each other and with Hartenstein in the theft of Plaintiffs' plan funds.


Based upon its examination of the Federal Policy in its entirety, and the undisputed facts in the record regarding the role of multiple PBA employees with respect to the manner in which Plaintiffs' plan funds were handled, the Court concludes that the judgments upon which Plaintiffs seek to collect from Federal resulted from theft by PBA employees under the client coverage insuring clause of the Federal Policy.

The Court has determined that Plaintiffs' loss of plan funds was a covered loss under the Federal Policy.  Plaintiffs are entitled to collect their judgments from PBA.  However, PBA is insolvent.

Section 3929.06 of the Ohio Revised Code allows judgment creditors to collect their judgments from the judgment debtor's insurer for covered losses.  The Court has concluded that

45

(5:10 CV 823)

multiple employees participated in the theft of Plaintiffs' plan funds, even assuming that Hartenstein is not an employee as defined by the Federal Policy.  Therefore, coverage under the client coverage clause does not result in a recovery by PBA for its own wrongdoing, but the wrongdoing of PBA's employees.  Further, payment of this covered loss pursuant Section 3929.06 benefits Plaintiffs, not PBA.

Accordingly, Plaintiffs' motion for summary judgment on their Supplemental Complaints pursuant to Ohio Revised Code Section 3929.06 against Federal is GRANTED.[35]  Federal's motion for summary judgment is DENIED.

B.      Gotham Policy

Gotham's and Plaintiffs' motions for summary judgment regarding coverage under the Gotham Policy with respect to Plaintiffs' Supplemental Complaints pursuant to Ohio Revised Code Section 3929.06 both require the Court to interpret the Gotham Policy to determine coverage.

The relevant underlying facts of this case are essentially undisputed.  However, the parties dispute whether those underlying facts support coverage under the Gotham Policy.  The arguments advanced by both parties in support of their motions for judgment as a matter of law regarding coverage of the Gotham Policy mirror their arguments advanced in opposition to the others motion.  Consequently, there is no need to separately analyze Plaintiffs' and Gotham's motions for judgment as a matter of law regarding coverage under the Gotham Policy as to Plaintiffs' Supplemental Complaints.

---

[35] It appears that the Plaintiffs' judgments exceed the limits of the Federal Policy.

46

(5:10 CV 823)

The core issue presented by Plaintiffs' and Gotham's motions for summary judgment with respect to the issue of coverage is whether Plaintiffs' judgments constitute "damages arising from a negligent act" under the insuring agreement of the Gotham Policy, and if the judgments are covered by the insuring agreement, is coverage barred by one or more exclusion in the Gotham Policy.

The insuring agreement in the Gotham Policy provides as follows:

**A.  Covered Services**

The Company will pay, on behalf of the Insured, **Damages** and associated **Claim Expenses** arising out of a negligent act, error, or omission resulting in **Claim** for financial loss, **property damage**, **Advertising Liability**, or **Personal Injury**, even if such **Claim** is groundless, false or fraudulent, provided that:

> 1.  The negligent act, error, or omission took place in the rendering of or the failure to render Professional services; and . . .

1.    *Plaintiffs' judgments are covered damages under the Gotham Policy*

The parties' dispute regarding coverage under this clause turns on the question of whether the judgments which Plaintiffs seek to collect in the Supplemental Complaints are "damages" within the meaning of the Gotham Policy's insuring agreement.  The Gotham Policy defines damages as follows:

> **Damages** means monetary judgment, award or settlement, except those for which insurance is prohibited by law. **Damages** does not include punitive or exemplary **Damages**, fines, penalties, sanctions, taxes, awards or **Damages** that are multiples of any covered fees, deposits, commissions or charges for goods or services. **Damages** does not include any amounts that represent, or are substantially equivalent to, the return, restitution, disgorgement, forfeiture or rescission of any personal profit, remuneration or financial advantage, or monies to which an insured was not entitled.

47

(5:10 CV 823)

Plaintiffs' Supplemental Complaints pursuant to Ohio Revised Code Section 3929.06 seek to collect the judgments awarded by the Court when it granted summary judgment in favor of Plaintiffs' and against PBA for the loss of Plaintiffs' plan funds because PBA breached its duty as an ERISA fiduciary duty in the handling of those funds. These judgments were not for the return or disgorgement of funds which PBA was not entitled to receive. PBA was entitled to receive Plaintiffs' plan funds for payment of claims made by Plaintiffs' employees pursuant to their plans.

Accordingly, the Court concludes that the judgments at issue in Plaintiffs' Supplemental Complaints constitute damages within the meaning of the insuring agreement of the Gotham Policy.

2.    *Recovery for loss of Plaintiffs' plan funds precluded by the Gotham Policy*

Even if Plaintiffs' judgments constitute damages as defined by the Gotham Policy, Plaintiffs' losses are not covered by the Gotham Policy unless the losses arise out of a "negligent act," error or omission. Further, Exclusion A of the Gotham Policy excludes coverage for any claim:

> Based upon or arising out of any intentional, willful, criminal, fraudulent, malicious, or dishonest act or omission by an Insured; except where the Claim also includes allegations of a negligent act, error or omission in the performance of your Professional Services; however, this Policy will not pay any Damages or further Claims Expenses in the event of an adjudication or admission by an insured that the act or omission was intentional, willful, criminal, fraudulent, malicious, or dishonest.

In granting partial summary judgment in favor of Plaintiffs, the Court ruled that PBA breached its ERISA fiduciary duty by using Plaintiffs' plan funds for its own account and

48

(5:10 CV 823)

benefit.  A claim for breach of fiduciary duty can be based on negligent, reckless or intentional conduct.  *Twin Maples Veterinary Hosp. v. Cincinnati Ins. Co.,* 159 Ohio App. 3d at 597.

Gotham contends that there is no coverage because the conduct of PBA's employees, which resulted in Plaintiffs' losses, was intentional.  Plaintiffs agree that the manner in which PBA employees handled Plaintiffs' plan funds was "not unintentional," but argue that the resulting harm to Plaintiffs was not intended and a consequence of PBA's negligent management.

The question of whether the undisputed evidence in this case constitutes a negligent act under the insuring agreement, or an intentional act under Exclusion A, are two sides of the same coin.  "By definition, negligent acts are not intentional."  *Blanton v. Alley*, 2003 WL 21152546 at * 5 (Ohio App. 4 Dist.).

The key to this analysis is that both the coverage language and exclusion language in the Gotham Policy focus on the ***acts*** of PBA and not on whether the resulting harm to Plaintiffs was expected or intended.

The acts at issue in this case are the manner in which PBA employees handled Plaintiffs' plan funds.  Plaintiffs agree that PBA's employees intended to: deposit Plaintiffs' plan funds into PBA's main account; not mail provider checks that were funded by Plaintiffs; use Plaintiffs' plan funds to pay for PBA's operations instead of paying providers; and to deceive and mislead Plaintiffs' and providers regarding the status of plan funds and provider payments when questions and concerns were raised.

49

(5:10 CV 823)

However, Plaintiffs contend that while the manner in which Plaintiffs' plan funds were handled was intentional, PBA did not intend the harm - i.e. the loss of Plaintiffs' plan funds - that resulted.  Citing *Physicians Ins. Co. of Ohio v. Swanson,* Plaintiffs argue that their losses are covered by the Gotham Policy because Gotham has failed to demonstrate that the financial harm caused to Plaintiffs was intended by PBA.

In *Physicians Ins. Co. of Ohio v. Swanson*, 58 Ohio St. 3d 189 (1991), the Ohio Supreme Court held that:

> [I]n order to avoid coverage on the basis of an exclusion for expected or intentional injuries, the insurer must demonstrate that the injury itself was expected or intended.  It is not sufficient to show merely that the act was intentional.

*Physicians Ins. Co. of Ohio v. Swanson*, 58 Ohio St. 3d at 193.

However, in *Allstate Ins. Co. v. Campbell*, the Ohio Supreme Court subsequently clarified the application of the doctrine of inferred intent with respect to intentional act exclusions, and determined that and insurer's motion for summary judgment may be properly granted when intent may be inferred as a matter of law:

> We now clarify that the doctrine of inferred intent applies only in cases in which the insured's intentional act and the harm caused are intrinsically tied so that the act has necessarily resulted in the harm.  Because this test provides a clearer method for determining when intent to harm may be inferred as a matter of law, we hold that courts are to examine whether the act necessarily resulted in the harm - rather than whether the act is substantially certain to result in harm.

*Allstate Ins. Co. v. Campbell*, 128 Ohio St. 3d 186, 196-97 (2010).

In *Campbell*, a group of boys placed a Styrofoam target deer in a road after dark.  Some motorists were able to avoid the fake deer without incident, but when one motorist took evasive

50

(5:10 CV 823)

action his vehicle overturned, resulting in injury to the occupants of the car.  The injured parties

sued the boys and their parents and their insurance companies.  The insurance companies filed a

declaratory judgment action seeking a declaration that they were under no duty to defend or

indemnify their insureds (the juveniles and their parents) on the grounds that the juveniles

intended to place the deer in the road and there was no coverage for damages resulting from this

intentional act.

     The insurance companies moved for summary judgment in their declaratory judgment

action.  The trial court granted summary judgment on the grounds that although the boys did not

directly intend to cause the harm, the trial court inferred their intent as a matter of law because

their conduct was substantially certain to result in harm.  The Tenth District Court of Appeals

reversed, holding that there were genuine issues of material fact with respect to whether the boys

intended to cause harm when they placed the fake deer in the road, whether the harm was

substantially certain to result, and whether those actions fall within the scope of their individual

insurance policies.

     The Ohio Supreme Court granted discretionary jurisdiction and reversed in part and

affirmed in part.  After clarifying the doctrine of inferred intent as quoted above, the Ohio

Supreme considered the language of each insurance policy.

     Three policies under consideration contained exclusionary language stating that the

insurers "will not cover harm expected or intended by the insured."  *Allstate Ins. Co. v.*

*Campbell*, 128 Ohio St. 3d at 197.  With respect to those policies, the Ohio Supreme Court

concluded that, "[i]n cases such as this one, where the insured's act does not necessarily result in

(5:10 CV 823)

harm, we cannot infer an intent to cause injury as a matter of law," and therefore summary

judgment was not proper.  Accordingly, the Ohio Supreme Court remanded that portion of the

case to the trial court to determine whether the boys expected or intended to cause harm, and

consequently, whether the insurance agreements provided coverage.

The Ohio Supreme Court's analysis was quite different, however, with respect to

American Southern's exclusionary language.  The American Souther policy excluded from

coverage bodily injury or property damage "which results directly or indirectly from . . . an

intentional act of any insured."   Because the exclusion was based on an **intentional act** and not

**intentional harm**, the Ohio Supreme Court concluded that the doctrine of inferred intent

analysis was not applicable.  Based on this conclusion, the Ohio Supreme Court reversed the

appellate court and reinstated the trial court's grant of summary judgment to American Southern.

Specifically, the Ohio Supreme Court reasoned:

> The policy issued by American Southern contains exclusionary
> language that differs from that found in the Allstate, Erie, and
> Grange policies, as well as the policies at issue in *Gill, Swanson,*
> and *Gearing*.  American Southern's policy states that coverage
> does not apply to " 'bodily injury' or 'property damage' which
> results directly or indirectly from * * * an intentional act of any 'insured.' "
> The American Southern policy is written in an extremely broad manner
> that declares that American Southern is not liable for harm resulting from
> any intentional act done by an insured. This language stands in stark contrast
> to the language of the other insurance policies at issue in this case,
> which exclude from coverage harm that is expected or intended by the insured.
>
> By using broad exclusionary language excluding coverage for harm caused
> by any intentional act - regardless of whether the harm is expected or intended
> by the insured - American Southern has worded its policy in a manner that
> frees it from the line of analysis found in *Gill, Swanson,* and *Gearing*.

52

(5:10 CV 823)

>In those three cases, each insurance policy excluded coverage for harm that was "caused intentionally" or "expected or intended" by the insured. [citations omitted.]  While those cases contained exclusions for an intentional or expected *injury,* American Southern's policy addresses an intentional *act*. Given the significantly different and unambiguous language of the American Southern policy, we must conclude that as a matter of law, American Southern is under no duty to defend or indemnify Dailyn Campbell or his family for any liability resulting from his intentional acts in participating in the events at issue in this case.

*Allstate Ins. Co. v. Campbell*, 128 Ohio St. 3d at 197-78 (emphasis in original).

In this case, there is no genuine dispute that PBA employees deliberately - not inadvertently or by mistake - deposited Plaintiffs' plan funds into PBA's main account and used Plaintiffs' plan funds to pay for PBA's operational expenses, all the while knowing that Plaintiffs' employees' health care claims were not being paid.  In fact, PBA's employees purchased additional file cabinets to store provider checks that had been funded by Plaintiffs but could not be mailed because those funds had been used instead to fund PBA's operations. PBA's employees even kept a spreadsheet of unpaid claims.  PBA employees were very much aware that Plaintiffs' plan funds were being used to pay for PBA's operations when those funds should have been used for claim payment, and that as a consequence, Plaintiffs' claims were not paid.

Further, PBA employees deceived and misled Plaintiffs and providers regarding the status of claim payment.  This deception occurred in response to direct questions by Plaintiffs and providers regarding the status of claim payments.  Even in the face of these concerns over

(5:10 CV 823)

unpaid claims, PBA's employees continued to use Plaintiffs' plan funds for PBA's operations instead of claim payment until even using all Plaintiffs' plan funds for PBA's expenses was insufficient to sustain PBA's operations.

Like the American Southern Policy in *Campbell*, the language of the Gotham Policy focuses on the "intentional acts" and "negligent acts" of the insured, not whether the harm was expected or intended or occurred because the actor was mistaken about his obligations.  There is no dispute in the record that the manner in which PBA handled Plaintiffs' funds was intentional. Intentional acts are not negligent acts.  These intentional acts resulted in Plaintiffs' losses and are precluded under the Gotham Policy.

Therefore, the Court concludes as a matter of law that the language of the insuring agreement and Exclusion A of the Gotham Policy precludes coverage of Plaintiffs' judgments because they resulted from PBA's intentional, not negligent acts.

Accordingly, Plaintiffs' motion for summary judgment on their Supplemental Complaints pursuant to Ohio Revised Code Section 3929.06 as against Gotham is DENIED.

Gotham's motion for summary judgment as to Plaintiffs' Supplemental Complaints is GRANTED.  The Court's ruling granting summary judgment in favor of Gotham and against Plaintiffs' as to Plaintiffs' Supplemental Complaints renders Gotham's counterclaims, and Gotham's motion for summary judgment as to its counterclaims, moot.  Accordingly, Gotham's motion for summary judgment as to its counterclaims is DENIED AS MOOT.

(5:10 CV 823)

## V.  CONCLUSION

For the reasons contained herein, Plaintiffs' motion for summary judgment (ECF 362) is GRANTED IN PART and DENIED IN PART.  Plaintiffs' motion for summary judgment on their Supplemental Complaints as to Federal is GRANTED.  Plaintiffs' motion for summary judgment on their Supplemental Complaints as to Gotham is DENIED.

Further for the reasons contained herein, Federal's motion for summary judgment (ECF 363) as to Plaintiffs' Supplemental Complaints is DENIED.

Further for the reasons contained herein, Gotham's motion for summary judgment (ECF 361) is GRANTED IN PART and DENIED IN PART.  Gotham's motion for summary judgment as to Plaintiffs' Supplemental Complaints is GRANTED.  Gotham's motion for summary judgment as to its counterclaims is DENIED AS MOOT.

The Court will not publish a Judgment Entry until after the status conference, scheduled below.

The Court will conduct a status conference on April 29, 2013 at 12:00 noon to discuss the next steps in the resolution of this case.  The Court will publish an order also scheduling a status conference on April 29, 2013 at 12:00 noon in Case Nos. 5:11 CV 1033, 1:11 CV 1038, and 5:11 CV 1512.

(5:10 CV 823)

Counsel are required to attend the status conference.  Party representatives may attend if they wish, but are not required to do so.  Counsel should file by April 19, 2013 at 12:00 noon their proposals for going forward in this case.


IT IS SO ORDERED.


  March 28, 2013                          s/ David D. Dowd, Jr.
Date                                    David D. Dowd, Jr.
                                        U.S. District Judge

56